Good morning, Justices. Rose Zoya on behalf of Appellant Rohnert Park Citizens. You'll have to speak up a bit. I'm afraid I'll get closer. How's that? Much better. Very good. I'd like to reserve two minutes for rebuttal, if you don't mind. You've also given us a promotion that I'm not sure we deserve. Well, I think we deserve it, but we haven't been given it. I'm going to address, you know, notwithstanding questions from the court leading me elsewhere, two issues. And one is whether the FONSI, in this case, the NEPA document, analyzed cumulative impacts of the Wilford Avenue overchange project in combination with the casino project. How far along was the casino project? I mean, how much specific information did they have that could have been included in the evaluation? That gets to the crux of the matter right there. And that's actually sort of the second issue, which I'm happy to go to, whether it needed to or should have analyzed those cumulative impacts. I'm going to start with the FONSI and go backwards. The FONSI was issued in November 06. And how far along was the casino project then? Had it broken ground? No, it had not. It still has not broken. It has not broken ground. Is the project still on the drawing board? Yes, I understand it is. Is it still a joint operation with Station Casinos? As far as I know, it is, yes. For those of us from Nevada, it's all in the papers, but Station Casinos is in bankruptcy. Nobody looks like they're closing in Nevada, but that may call the whole into question, the entire project. Well, it may. And there is case law that says that if the project is reasonably foreseeable, even if it never happens in the future, because we're looking at what happened, what was known at the time of the FONSI, you still need to assess the cumulative impact. But it does reinforce that this was still even pretty speculative. The casino is on the drawing board. Were there architectural drawings? Do we know how big it was going to be? Before project approval, the EIS was out. Before the FONSI, what we had was starting in, FONSI was November 06, so starting in February of 04 was the first, and I realize that that was a location a little bit down the road, but let me start there if you don't mind, was the first notice of intent to prepare the EIS for the hotel. That was at what we call the Stony Point location. Then it moved closer to Wilford Avenue. I mean, I'm sorry, it moved closer to 101 down Wilford Avenue. At that time, there was, like I said, the notice of intent, and it gave some, and that was in the Federal Register, it gave some relatively vague information about the size of the entire facility, which is 762,000 square feet and involves various elements. In February of 04, same month, a few days later, there were public notices announcing the proposed casino hotel project in the Santa Rosa Press Democrat, noticing a scoping meeting. That scoping report for that scoping meeting came out in August of 04, and that, I realize, was still for the Stony Point location. In any event, at that point, we didn't know, the Federal Government didn't know, no one knew it was going to move closer to 101, so that was the information known at the time. In that scoping report, it gave some relatively detailed information that it was a proposed development of a casino and hotel resort project on approximately 363 acres, what roads and land uses bordered those 363 acres. There was information that Highway 101 provides regional access to the project site. Local access is provided from Rohnert Park Expressway, which is a road in the City of Santa Rosa. It also said that Rohnert Park Expressway and Wilford Avenue provide access from Highway 101. It also said that the casino hotel resort would include restaurants, a performing arts venue, banquet meeting spaces, a pool and spa, and specific square footages were provided for each of those elements for the total of 762,000 plus square feet plus 6,400 parking spaces. Now, the environmental assessment, though, didn't they consider the casino? And that goes to my first issue, is whether they did analyze the casino. They didn't consider the casino. They mentioned the casino. The casino is mentioned in the EA and FONSI. Don't they specifically mention that the casino is intended to use a different exit? I don't believe so, Your Honor. At least my notes are 68, 69. Oh, that would be in the comments section. Do you mind if I go and grab my copy? Okay. Because the FONSI is broken into various sections, so to speak. There's the, you know, content of it, then there's some appendices, and there's the comments and responses to comments. I have page 69 of the FCR, which is page 62 of the FONSI, where the FONSI says, the casino project, if approved, the city will recommend the casino traffic utilize route 101 rather than local streets. Right, but if you look at the map of the, and two things with that. Number one, that's a response to comment. It's not an analysis of cumulative impacts. Number two, if you look at a map of the area, 101 doesn't, you have to take Wilford Avenue to get over to the casino from 101. So, where is the exit? Is there an exit on Wilford? There is, yes. There is existing now. There's an exit when you're going, I just drove through it this morning because I'm in Santa Rosa. When you're going north, you take the Wilford Avenue exit, and that takes you to the west side of the highway, which this project is proposed on. Currently, and this is in the record in various places, currently, if you want to then go east, you go, you take a route around Wilford Avenue, and you go back under the highway, and you connect up with Golf Course Drive, and you head east, and you can eventually make your way to Petaluma Hill Road, for example. Golf Course Avenue is on the opposite side from the casino, isn't it? Yes, however, this project proposes to punch through 101. Yes. And connect Wilford with Golf Course Drive, so it would be one road. And you go under this project, you don't go on Golf Course Avenue then. If you do that, however, Golf Course makes its way to all of the east side, most of Rohnert Park, frankly, and over to Petaluma Hill Road, which is. But if you want to go to the casino. If you're on 101, but that's not the only access. Let me ask this, but I thought your principal argument was that they failed to adequately consider the combined environmental effect of this. Yes. Well, what I'm coming back is they do consider in some fashion the casino, at least in the response to the objections. They talk about the casino's plan. Nobody knows exactly what it's going to be. But from the information we have available at this time, we don't think it's going to have a major impact. I don't even know that there was that conclusion, Your Honor. There isn't any conclusion based on analysis that, two things with that, based on analysis that there is no cumulative impact. The analysis was not done. And what they did know was, starting with what I was speaking to earlier, they knew specific square footages of specific elements of a project. From that, you can extrapolate traffic models. What do casinos engender in traffic? This is something that people do, that experts do. They did that in this case, didn't they? No, they did not, Your Honor. I thought they went specifically to the local traffic information and considered whether it was going to have much of an impact. The data include potential traffic generated by the proposed casino. I'm sorry, there was a call. The data include potential traffic generated by the proposed casino. There would only be an incremental increase to traffic at the Golf Course Drive-Roberts Lake Road intersection. And may I ask what page of the record that is, Your Honor? Page 69 of the SCR. I think it's, oh, which is 62 of the. 62, right. I think it's under heading two is what I see. Right, right. What that says, Your Honor, and I did raise this in the brief, but I'll discuss it here. I'll read it if you don't mind. Preliminary traffic data, which is being generated for the city's general plan amendment, shows that 2020 traffic in the project area is within 5 to 10% of the traffic numbers shown by Caltrans in this document. Okay. The data include potential traffic generated by the proposed casino. The data, which was being generated for the city's general plan amendment, there would, and then they conclude that there would only be an incremental increase to traffic at the Golf Course Drive-Roberts Lake Road intersection. Number one, this isn't a response to comment. None of this type of comment was made in the FONSI or any of the appendixes. So at best, if this is going to be considered a cumulative impacts analysis, which it is not, this should have been recirculated for public comment because it was not in the original document that circulated. This is a response to comments. Number two, it doesn't analyze the cumulative impacts of the casino. It doesn't refer to or incorporate any traffic studies or any analysis that, for example, when was the city's general plan amendment data generated? Was it generated before we knew that? If you don't even know hardly anything about the casino or whether it will be built or... That's what NEPA requires, reasonably foreseeable projects. It doesn't require that it's built. It doesn't require that it's definitely going to be built because we can't, of course, see into the future. Anything could happen with a reasonably foreseeable project. It requires analysis of reasonably foreseeable projects, and this FONSI acknowledges that it's a reasonably foreseeable project because it includes it on lists of reasonably foreseeable projects, but it doesn't do the next step. It doesn't give us any extrapolated numbers from the square footages and uses, which is possible for traffic engineers to do. We see it all the time in environmental documents. It doesn't tell us what those numbers combined cumulatively with this project is and how that additional traffic would flow on the now, not now, but the 2B1 road, Wilford and You acknowledge they looked at the combined effect of the casino. Is your argument just that they didn't do a satisfactory examination? Your Honor, we don't acknowledge that they looked at the combined effect of the casino. There is the only mention in the FONSI of the casino project is in one paragraph on page 21, which is affected environment in the growth. That's that section, and then it references table B1, which acknowledges that the casino hotel project is a project in the study area. And why is the language on the appendix page 69 or 62, why isn't that considered to be something they discussed or considered? Well, as I explained, those are general conclusions, and they don't, that language. Is that part of the FONSI? Yeah, but it's in the responses to comments. It's after people commented on it. It's in the responses to comments. Are you sure that 4.1 is not the comment of the preparers of the FONSI that they're, when they give the facts and then they comment on those, they comment on the Wilford Avenue golf course, that they're not explaining? Isn't that an explanation by the preparers of the document? Well, the page 62 is, flows from page 60, which is chapter 4, comments and coordination. And you'll see the... Whose comments are they? Generally, in EISs and EIRs and FONSIs, in environmental documents, they have the content of the document, and then they may have technical appendices, and then people have a comment, ability to comment during a comment period. And you'll see that there's names of local citizens, et cetera, here. And then the... This doesn't seem to be that. This doesn't seem to be comments by outsiders. This seems to be comments by the preparers of the FONSI. It may not be, I guess, because 4.3 talks about opportunities for public. Right. I see what you're saying there. I can't guarantee... The public comments seem to be in 4.3. Right. And I, you know, I'm seeing your point by looking at the headings, but I'm not willing at this point to say that these are not responses to comments. And that's not even my strongest argument, frankly. I hope so. Right. My strongest argument is that those one, two, three, four, five lines on page 62 do not constitute a cumulative impacts assessment. There is a... There are comments on cumulative impacts in 4.2 at the bottom of that page and over on page 63. Right. But it doesn't talk about traffic, about traffic or concomitant air quality impacts that come from additional traffic, that sort of thing. So what we're looking for, and, you know, the FONSI seems to acknowledge it in some places, the need for a cumulative impacts analysis. What would a cumulative impact analysis have looked like? What would the cumulative impact analysis you would like to have seen done look like here when they haven't got a casino plan other than just a pie in the sky proposal? Your Honor, it's not a pie in the sky proposal. It's been on the books. There's a lot of public controversy about it. It's been on the books for a number of years. They've done environmental documentation on it. They've done the scoping. They've done the EIS. That doesn't... That's a project in the pipeline. That's not a pie in the sky. It's not a pie in the sky. What was the... And the EIS, I'm sorry, I think maybe you gave us that. I didn't give it to you orally. When was the EIS on the casino? This is an EIS prepared by whom? Prepared, I believe, by... Caltrans? No, no, no, no. It's the NEPA document and it's the federal... I think it's the Indian Gaming... The Indian Gaming Board? Yeah, commission or... I'm sorry, I don't have it. All right. And when was that prepared? That was prepared in March of 2007 and that was after the FONSI, but it was before project approval. It was before the Wilford project. Approval, which was in June 07. The notice of availability is referenced in the ER at 48, number 46 on the docket. I think that's the docket. So it wasn't pie in the sky and there was enough... I'm getting repetitive, but I'm trying to answer the questions. There was enough information to extrapolate or assume traffic counts because we knew sizes. We knew how much parking spaces there are. We knew what types of uses there are. And that's the type of information that a traffic consultant looks at and is able to estimate traffic flows. I may say it's inadequate or insufficient, but that's seemingly what they were trying to do in 4.1 paragraph 2. They did estimate what the... As of that time, the preliminary traffic data, which was all they had, and they did show the effect of that. But Your Honor, that's traffic data that's not even in the record. This is a conclusory statement. So the public and the decision makers are supposed to look at this and say, oh, there's no problem. When did they move the location of the casino? They moved the location in September 05. There was a supplemental notice of intent to prepare the EIS. And then they did the scoping report on that, which has a lot of information in it on the project in February 06. There was also, I want to point out, there was also five public meetings held between March 04 and October 05. There is case law that says that the federal agency, and they in fact acknowledged it in this FONSI, they said we're continuing to gather information on it. At five public meetings, a lot of information could have been gathered. So our position is that these five lines on page 62 of the ER do not accumulative impacts analysis make under law. There is not an analysis. There's no indication of showing what's significant, what's not significant. It's a bare conclusion buried in the section that is labeled comments. I just wanted to ask you one, so I understand. Is it only the sort of underpass that we're talking about? It's called an interchange. Right. It also involves realigning, I believe, the interchange and putting HOV lanes in. On 101? Yes. So they're expanding the 101, the breadth of 101. Yes. And they're building a tunnel sort of under 101. Yes, you're correct. To connect the two streets that lay perpendicular to the highway, which is Wilford Avenue to Golf Course Drive. Yes. That's the part that's of concern vis-a-vis the accumulative impacts analysis. But it's part of the whole project. Well, the project, it consists of two things, widening 101. I'm sorry? It consists of two things, widening 101. That's to add high occupancy vehicle lanes and then raising. I think they're actually going to raise 101 and tunnel under it. I'm trying to understand why the impact on the people who live on Golf Course Drive. Because there's testimony in here, and I won't take the time to reiterate unless you'd like me to. I did set it forth pretty clearly in our briefs. And the concern that has been raised is that by connecting Wilford and Golf Course Drive, that becomes an area that the casino traffic will traverse. Because if you go east on Golf Course Drive, you access other known to people in the area, other known ways to get out of the city or even to be in the city. It connects up with Petaluma Hill Road at some point, which is a highly traveled road as an alternative to 101. And, again, as I stated, the FONSI seems to acknowledge that that's something that is, and I'm using my own words, of concern or something that should be looked at, but it doesn't actually do it. And that is our, you know, it's a pretty discrete issue. And that's what we're saying needs to be done and has not been done. Thank you. Thank you. Thank you. May it please the Court. My name is Robert Oakley. I'm here on behalf of the U.S. Department of Transportation. With me at Council's table is Mr. Brett Gaynor, an attorney with DOT. I'd like to start out by just correcting one factual misstatement. The EIS for the casino, which is a project that the National Indian Gaming Commission oversees, not DOT, the final EIS was completed in 2009, February 27, 2009. What Council referred to as happening in March of 07 was a draft EIS that came out after the EA-FONSI had been issued by DOT in this case. And Council, in her reply brief, as I read it, disclaimed any argument that the draft EIS created a supplementation obligation on behalf of DOT. It's important, though, to look at the record of how DOT proceeded. The EA did not appear out of thin air in November of 2006. It was preceded by considerable study that looked at a lot of issues, including the possible impacts on endangered species. There was a need for biological opinion. The draft EA was done in 2004. Now, if we go back to 2004, as Council conceded, the casino was initially, when it was initially being talked about, at that point you only have a notice of an intent to prepare an EIS, which gives you no hard data to analyze. Plus, that location in 2004 changed so that when the draft EA was out there, there was virtually nothing to say about this casino. Nobody even knew really where it was, and it changed in between. And that's why, and there's no case law, by the way, to support that, by goodness, you've got to have cumulative impacts in a nice section saying cumulative impacts, and you can't respond to things that have happened, rather, in the interim where the casino seemed to make some progress, not a whole lot, but its locations changed, another notice of EIS went out, there were some scoping done, but again, no hard data was done, and so that's why it's picked up in the comment section, and they did the best they could. They, again, it's conceded in the reply brief, and I think even in the opening brief by the plaintiff here that there's no obligation on the part of the Department of Transportation to go off and do NEPA studies on a project it has no approval authority over, no control over. It does know about things like traffic, and by the way, there's no argument here, absolutely no argument, that these two actions, and by these two actions, I mean the modification of 101 and the reconfiguration, it's not a new intersection, it's a modification of an existing intersection  that's being done because the casino might be built, rather that's being done because there are traffic problems that have been longstanding on Highway 101, and Well, it doesn't seem to me that that matters, I mean, when you look at the effect of the modification you're making, you look at what the existing things are there, whether they require separate EISs or whatever, it doesn't matter, whether it's under your control, if you had five major hotels there, you would take that into account when you were looking at the effect on traffic, whether you change that or not, if it made it easier for everybody to get to those hotels, you would take that into account, that would tell you how much traffic you're going to get, and all you're saying really is to what extent do you have to take into account a potential building, if there are five more hotels coming, you would take that into account if you knew it, when you look at what is the traffic going to be, you look at what's there and what you think is going to be there realistically. I think that's right, Judge Reinhart, you look at what you know, and what you can reasonably foresee, but you don't speculate, you have no obligation to speculate, and this Court has said that before, that for example, and this is even where the projects are within the same agency, in like the Epic case or the Blue Mountain case, where say one timber project was proceeding, there was one expected to happen in the future, but it was at very early stage and not much was known about it, and the Court said, well, no, that doesn't really have to be addressed in cumulative impacts, in any event, it will be picked up, NEPA will have to be done on that project, that project will have to address the cumulative impacts of the project that was actually in front of the case, as here, if you were to pull, we have the web address for the internet address for the EIS, for the final EIS that the National Indian Gaming Commission pull out, they talk about traffic, they talk about this project and the cumulative impact, so it's not like NEPA gives this a pass, but the point being that the agency can't do the impossible, and when you look again back to when they did the first draft EA in 2004, and then they put out the final EA in 2006, they don't have hard data, you don't get hard data at public meetings, what you get at public meetings are people voicing concerns about whatever it is that the government may or may not do, you don't get hard data, there's been no pointing to any hard data that we ignored, in fact, what we did, we went and found what hard data we could, we talked to the people in charge of traffic at the city of Rohnert Park, and they said, look, we're going to try to route this traffic a different way, so there shouldn't be any impact here, and secondly, we just think it's going to have at most an incremental impact, and we're projecting that out 10 years, and meanwhile, here we stand in March of 2010, and there's another case challenging this casino in this circuit, challenging the Department of Interior's decision to take land into trust for this casino in this circuit, the casino has not been built, and it's just, we... Well, you know, I don't think it helps much that there's going to be another EIS on the casino, that they're not going to stop the casino because of this, the question of whether you do this traffic study before you build this road, you know, I don't think about it, I mean, either you have to consider the casino or you don't, and I think your position is, A, we don't have to consider it, but B, if we did, we considered it to the extent possible. Yes, we considered it to the extent possible. But I mean, to say that we don't have to consider it because there's going to be another EIS doesn't really... Well, I'm just following really the analysis... I mean, it doesn't matter whether it's going to be an EIS or not, the example of, you know, five hotels, they may not require an EIS, and it doesn't help that the project is one that does. Well, first, I think I'm following this Court's case law in the Epic case and the Blue Mountain case where the later project would be picked up by NEPA was considered relevant to at least those panels. But putting that aside, I would disagree with something that you said earlier, that, well, they won't do the casino because of the traffic. Well, I think that in the decision... Now, I am, to be clear, not here representing the National Indian Gaming Commission. I have no authority to do that or to speak for them. But it would seem to me in determining whether to allow the casino to go forward or not, NIGC would look at the impacts on the neighboring area and traffic would certainly be one of them, and it's certainly extensively discussed in that EIS. But am I right that you have two positions? One, you don't have to consider the casino at all, and two, you did consider the casino? I don't think that our position is that strong, that we had absolutely, utterly no obligation to consider the casino at all. I think where I want to be clear on, though, is that we didn't have an obligation to duplicate the type of NEPA analysis that you will find in NIGC's EIS to fill the void that existed at the time. In other words, say the chronology here was quite different. Say the casino's EIS had issued before the EA Fonzi had issued and you had all of these studies out there. I think that would have been taken into consideration. Now, how it would have been taken into consideration, the EA Fonzi, I don't know. Perhaps they would have simply tiered to it because they could have done that. They could have simply incorporated NIGC's analysis. I'm really speculating because I'm in a hypothetical. But I think a world where there is a lot of hard data that's been generated on this project is a different world than the world that we're in. All right. So that's the second thing. Your second position is that you considered it to the extent that it was practical to consider it at the time, is that right? Yes, Your Honor. And you think that you did an adequate — you did consider it and you considered it adequately? I think so, given, again, the high degree of uncertainty and the lack of an obligation on DOT to do the NEPA analysis for NIGC or to duplicate the NEPA analysis that NIGC would have to do to get that project. I don't know if it's going to be approved, but to get that project where it could be either voted up or down by the relevant decision makers. And we just — we did not have that information. And you look at what is cited as hard information. There are things like notices of intent to prepare an EIS, scoping meetings. All scoping meetings do is try to identify the issues that will be considered. They don't generate hard data. Public meetings absolutely do not generate hard data if you've ever had the joy of sitting through one. They generate people who are understandable. I understand this if I live — Is this 4.1 comments? Are those comments by the agency or by the public? Well, those are comments by the agency in response to comments by the public. Because between 2004, when the draft EA comes out, some progress is made on this casino. Not much, not in the way of hard studies, but people are now very concerned about the casino where they might not have been in 2004. So they're getting these comments. And so the agency is taking a reactive position on this. They're not just sitting back and saying, oh, well, we don't have to worry about this. No, they're going to run it — the people in Rohnert Park, the city now. And they're saying, well, what about this casino? Is this going to affect this project? And they're saying, not that we can really see it. It's going to have only a small impact on traffic in this area. We're going to try to route it to a different interchange off of 101 than the Wilfrid Avenue interchange. And those paragraphs on page 62 that relate to the casino, is those the — that's the extent to which you consider the casino, right? In terms of traffic, yes, Your Honor. I think it's mentioned in some other places. No, no, you're right. It is mentioned elsewhere. But in terms of traffic — But in terms of traffic, I think that's where to look. Yes, Your Honor. And that constitutes part of the EA? Yes, Your Honor. It is definitely part of the EA. Yeah. And that should be considered — well, the question is, did you consider it? Yes. Your comments are — the comments would be enough, in your opinion, to show that you considered it. I certainly, Your Honor — in defending — I spent a lot of my life defending EISs and EAs. And I tell you, I go to the comments section, response to comments all the time, because that is where the agency shows that it meets the standard under the APA. That's where the agency shows that it looked at the problem, considered it, and gave a reasoned response for its decision. And NEPA doesn't create some hyper-technical requirement that you've got to put various labels in it. The comments section, and in many ways, whether it's an EIS or an EA, is really the heart of showing that the agency met its burden under the Administrative Procedure Act. And DOT met it here. So I — unless the panel has additional questions, I'll just rest on our briefs and ask that the District Court be affirmed. Thank you. And I will try to be brief. So we've heard that on page 62, that's the extent of the alleged cumulative impacts analysis with respect to traffic. This is the first time that I've heard that the responses to comment is the most important part of the environmental analysis. The analysis is supposed to happen in the main body of the document. For example, I'm going to use an EIS. The main — that's where the analysis happens, and it's based on technical studies. And then they summarize it and apply significant standards and come to a conclusion on significance and impose mitigation measures, if it's appropriate. And then the public comments on that — you know, we don't think you did a good job here. Why didn't you consider this? And the agency responds to it, and that aspect of it is not recirculated then for comments again. CEQA — I mean, I'm sorry. NEPA requires that an agency take a hard look at impacts. An accumulative impact is the impact on the environment which results from the incremental impact of the action — here, the interchange project — when added to other past, present, and reasonably foreseeable future actions — the casino hotel project. And the NEPA document is supposed to consider the proximity of the projects geographically and temporally, the probability of the projects affecting the same environmental system — the roadway here — and the likelihood that the project will lead to a wide range of cumulative impacts — and we're talking about traffic and the concomitant impacts, air quality, noise, and that sort of thing. The EA must contain data analysis and explanations that convincingly demonstrate that the lead agency has taken a hard look at the potential environmental impacts, including, of course, cumulative conclusions in a FONSI that are not supported by information in the EA may be considered arbitrary and capricious and thus vulnerable to legal challenge. And I take that from the NEPA book. It's also in my brief. So NEPA — we know that it doesn't forbid harm to the environment, but it requires the governmental agency to evaluate that harm and explain why the action is justified despite the harm. These — which we now know are comments to responses — and my impression was that this was sort of the part of the general responses, and then the document got into individualized responses. This response to a comment is not what NEPA requires as far as a cumulative impacts analysis. I wanted to countermand, if I may, that — with regard to the first comment my colleague made regarding timing of the EIS for the casino project. I acknowledge that it's the draft environmental impact statement in March 2007. That's the more important one, if I may say so, because the final EIS often only contains — well, it does contain any corrections to the draft EIS and then the responses — and then the comments and responses. It's not the document — the final EIS volume is not the document that explains the project. So we had that before project approval, as well as, as I said, the various elements of the project. And with that, I would refer the court to the Thomas case. I know I'm out of time, and I don't want to overstate my welcome. Refer the court to the Thomas case with respect to a reasonably foreseeable project, the timber sales, which was not defined in minutia, and the requirement to do a cumulative impacts analysis there. And I thank you for your time. Thank you. The case to be argued will be submitted. The court will stand in recess for the day.
judges: Gwin, Reinhardt, Bybee